JOSEPH DeGRAW, Plaintiff-Appellee, Cross-Appellant, *v.* STATE SECURITY INSURANCE COMPANY, Defendant-Appellant.—(COUNTY INSURANCE SERVICE, INC., Defendant-Cross-Appellee; LEO R. COX, Defendant-Cross-Appellee and Cross-Appellant.)

First District (2nd Division)    No. 58978

Opinion filed June 22, 1976.—Rehearing denied July 29, 1976.

Andrew H. Marsch, of Wheaton, for appellant State Security Insurance Company.

William J. Harte, Ltd., of Chicago, for appellee Joseph DeGraw.

Peterson, Ross, Rall, Barber & Seidel, of Chicago, for cross-appellee County Insurance Service, Inc.

Paul W. Schroeder, of Chicago, for cross-appellee and cross-appellant Leo R. Cox.

Mr. PRESIDING JUSTICE STAMOS delivered the opinion of the court:

This action was commenced by Joseph DeGraw against State Security Insurance Company (hereinafter referred to as "State"), County Insurance Service, Inc. (hereinafter referred to as "County"), and Leo Cox, whereby DeGraw sought payment of a judgment previously entered against him and in favor of one Jerry Stastny in the amount of $55,000. The trial court entered judgment on the jury's verdict which had found in favor of DeGraw as against State, and in favor of County and Cox as against DeGraw. DeGraw's damages were assessed in the amount of $55,500 plus costs. Pursuant to DeGraw's motion, this judgment was subsequently modified to $69,651.70 plus costs to include the interest which had accrued on the Stastny judgment previously entered against DeGraw.

On appeal, State seeks reversal of the judgment entered against it; on cross-appeal, DeGraw asks that the judgments in favor of County and Cox be reversed; and in the event the judgment in favor of Cox is reversed, Cox on his cross-appeal seeks reversal of the dismissal of his counterclaim against State and the entry of judgment in his favor on the said counterclaim.[1]

I.

This controversy arose from an automobile accident involving vehicles driven by DeGraw and one Jerry Stastny on October 15, 1965. Thereafter, Stastny joined DeGraw as a party defendant in an action commenced in Kane County, Illinois. (Stastny v. Dave's Lounge, Inc., et al., No. 65-3056.) That suit was filed on behalf of Stastny individually, his three children, and the estate of his wife who was killed in the accident.

DeGraw asked State to defend him in the action brought by Stastny, and, in the event of an adverse judgment, to indemnify him within the terms of an automobile liability insurance policy which he believed was in effect on the date of the accident. State provided DeGraw with a defense, but under a reservation of rights agreement, signed by DeGraw, wherein it was provided that State neither waived its right to deny coverage, nor admitted liability, as a result of its legal representation of DeGraw.

When State declined to pay any portion of the $55,000 judgment

---

[1] The trial court dismissed Cox' counterclaim after the jury returned a verdict in his favor. When DeGraw filed a post-trial motion seeking judgment against Cox notwithstanding the verdict, Cox also filed a post-trial motion pursuant to section 68.1 of the Civil Practice Act (Ill. Rev. Stat. 1971, ch. 110, par. 68.1), requesting a conditional ruling on his counterclaim. All post-trial motions were denied.

entered against DeGraw, DeGraw (hereinafter referred to as "plaintiff") brought this action against State demanding that it pay the full amount of the judgment, together with interest thereon, and $500 for his personal medical expenses which he alleged was also covered by the insurance policy. Joined with State as defendants were Cox, plaintiff's insurance broker, and County, a producer of insurance which placed insurance with various companies for local brokers. The counts alleged against each defendant sounded in both tort and contract. In addition, "bad faith" on the part of State during its legal representation of plaintiff in the *Stastny* action was alleged.

The principal issues presented for review are the following: (1) whether sufficient evidence was adduced at trial to establish State's liability to plaintiff; (2) whether the jury correctly found in favor of both County and Cox; (3) whether the legal representation granted plaintiff by State was conducted in such a manner as to justify a verdict against State for an amount exceeding the limits of the insurance policy; (4) whether the trial court committed prejudicial error by excluding a written statement and certain answers to interrogatories by plaintiff; and (5) whether certain rulings by the trial court with respect to tendered instructions constituted reversible error.

## II.

Much of the evidence adduced at trial pertained to the business relationship established among defendants. In 1965, State primarily engaged in extending substandard or "high risk" automobile insurance coverage. County placed insurance with various companies, including State, pursuant to its receipt of applications for insurance submitted by individual brokers. In 1964, County and State entered into a written agreement wherein their business relationship was delineated. Although County was not authorized to solicit applications for insurance on behalf of State, County was granted the authority to bind certain risks for State and to collect premiums.[2] However, County's power to bind certain risks was limited to applications for the issuance of a new insurance policy by State, but did not extend to requests for the renewal of an existing policy. It was further agreed by State and County that the terms of the written agreement would remain in confidence.

The president of County testified that his company communicated daily by telephone with State's underwriting department to ascertain

[2] Throughout the record, three terms are frequently repeated, and consequently, they will be employed in this opinion. An "application" pertains to a new underwriting risk and is a written request for the issuance of an insurance policy. A "renewal request" is submitted by an insured when seeking the renewal or continuation of his policy effective at the termination of its present term. And a "binder," although generally mentioned in regard to applications rather than renewal requests, when placed upon a risk, has the effect of making the subsequent issuance of a policy by the insurance company obligatory.

what risks would be accepted by State. This frequency of communication was deemed necessary since the type of risk considered acceptable by State often varied. As established through the ordinary course of business between County and State, it was the witness' belief that if 3-4 days elapsed after a written order was submitted by County to State for the issuance of a new policy or for the renewal of an existing policy, the failure of State to notify County within that 3-4 day period of its rejection of the order would indicate to County that the risk had been accepted and that a policy would be issued. If less than 3-4 days remained before the date on which the coverage was desired, the order would be transmitted to State by telephone with a written request to follow. By this latter procedure, County would know whether the risk would be accepted by State prior to the date on which the coverage was desired. In the event of a rejection of an order by State, County would then attempt to secure coverage through another insurance company.

The testimony of State's underwriting manager, who was also its vice-president, conflicted in part with the testimony of Company's president. This witness emphasized that the written agreement between County and State in respect of County's power to bind referred solely to applications and not to renewal requests. The witness further stated that, if a renewal request was rejected by State, County would usually be advised of that decision within 2-3 days, if possible, after the request was received by State. Under some circumstances, however, more than 2-3 days would be required for State to evaluate the risk. Consequently, the witness believed that County could not assume that a policy would be issued until notified of State's decision, notwithstanding the lapse of time from the date on which State received the order.

In 1965, Cox was an insurance broker who occasionally utilized County's services for placing high risk automobile insurance with State. Cox was not an agent for State, and as a result, he corresponded with County pertaining to policies issued by State for his clients. Pursuant to conversations he had with County's president, it was Cox' understanding that County was authorized to bind both applications and renewal requests with State. Although Cox did not enter into a written business agreement with either County or State, he conducted his business in accordance with an understanding that he would be notified by County within 2-3 days after he submitted a renewal request if that order was rejected by State. After 3-4 days had elapsed, Cox would assume that the risk was covered if he had not been advised to the contrary.

The chronology of events underlying this controversy is undisputed. Due to the large number of events and the significance of the date on which each occurred, these facts will be set out in tabular form. All dates listed occurred in 1965.

| DATE | DESCRIPTION OF EVENT |
|------|---------------------|

**APRIL**

12      Plaintiff secured an automobile insurance policy from State through County and Cox. The policy was scheduled to terminate on October 12.

**SEPTEMBER**

1      Cox mailed a letter to plaintiff suggesting that plaintiff renew his policy.

**OCTOBER**

1      While driving his automobile, plaintiff struck a pedestrian.

4      (1) Cox was notified by plaintiff of the accident on October 1.

       (2) Notice of the accident was transmitted from Cox' office to State.

6      Plaintiff went to Cox' office, requested a renewal of his policy, and paid a deposit on the premium for the renewal policy.

7      (1) County was notified by State of the accident on October 1.

       (2) Plaintiff's renewal request was received by County from Cox.

       (3) Plaintiff's renewal request was forwarded to State from County.

(Friday)

8      State received plaintiff's renewal request.

9      Plaintiff paid the remainder of the premium for the renewal policy to Cox.

(Tuesday)

12      Plaintiff's original policy with State expired.

(Friday)

15      (1) Cox mailed a letter to County requesting that plaintiff's renewal policy be forwarded to Cox.

(2) First action taken by State on the renewal request.

(3) That evening, plaintiff was involved in the accident with the Stastny automobile. (This is the occurrence that caused the litigation at bar.)

16    State mailed a letter to County advising that plaintiff's policy would not be renewed.

19    Cox mailed a "third request" to County regarding the renewal policy.

20    Cox received a memorandum from County advising that State had declined to renew plaintiff's policy and that coverage had been placed by County with another insurance company effective October 18.

### III.

State initially contends that any obligation that it may have owed plaintiff terminated on October 12 when plaintiff's original insurance policy expired. It is further argued that any liability by State to plaintiff for an occurrence subsequent to October 12 must necessarily be based upon a theory of either contract or agency because of plaintiff's failure to allege a count in tort against State in his fourth amended complaint. In support of this position, State maintains that plaintiff's renewal request constituted an offer which required an acceptance by State before a contract of insurance could be created. And in denying liability predicated upon agency principles, State contends, in essence, that Cox was not an agent for State; that State did not deal directly with either plaintiff or Cox in either the original or the renewal request transaction; that neither plaintiff nor Cox could rely upon the ordinary business procedures established between County and State since neither possessed knowledge thereof; and that County was not authorized by State to issue binders covering renewal requests.

In response to State's arguments, plaintiff contends that sufficient allegations of fact were contained in his complaint, and that competent evidence was adduced at trial in support of these allegations, upon which the jury's verdict against State can be sustained on any one of three theories: tort, agency, or estoppel. These theories are consistent with the posture of the case as it was presented to the jury. The jury was instructed that it could find against State and in favor of plaintiff if it found from the

evidence that plaintiff suffered damages as a result of one of two mutually exclusive situations: first, that State did not act within a reasonable time in giving notice of its decision not to renew plaintiff's policy; or second, that plaintiff was covered by insurance on the date of the accident as a result of either the actual or apparent authority of County, as granted by State, to issue binders on renewal requests.

Although we consider plaintiff's position whereby he contends that State should be estopped from denying its liability to plaintiff to be more compelling, we will begin with an analysis of fundamental principles of agency and their application to this factual situation.

■■ The term "agent" is broader in scope than the closely related term "broker." (*City of Chicago v. Barnett*, 404 Ill. 136, 88 N.E.2d 477.) A broker neither maintains a permanent employment with, nor a fixed relationship to, a particular principal, but rather he holds himself out to the public generally, whereby his status in each instance after obtaining employment is that of special agent for a single purpose. In comparison, an agent engages in a continuing relationship with a particular principal, to whom he owes his allegiance. (*City of Chicago v. Barnett.*) In view of these descriptions, it can be said that every broker is an agent, but every agent is not necessarily a broker. (12 C.J.S. *Brokers* §3 (1938).) It is a person's conduct, rather than his title, which is determinative of whether he serves as the agent of an insurance company or as the broker for an applicant for insurance in a particular transaction. *Tri-City Transportation Co. v. Bituminous Casualty Corp.*, 311 Ill. App. 610, 37 N.E.2d 441.

In the instant case, it is undisputed that Cox was an insurance broker in 1965. Moreover, Cox' conduct with respect to plaintiff establishes that he was plaintiff's insurance broker and not an agent representing the interests of State. *France v. Citizens Casualty Co.*, 400 Ill. 55, 79 N.E.2d 28.

■■ With respect to County, State denies that County was its agent. However, the written agreement entered into by State and County suggests otherwise. That agreement expressly authorized, albeit in a restrictive fashion, County to act on State's behalf in specific insurance matters; County was granted actual authority by State to issue binders on certain applications. Apart from this written agreement, County was authorized to collect premiums and to deliver policies for State. But it is likewise clear from the record that County was not expressly authorized by State to issue binders on renewal requests. However, we consider it unnecessary to determine whether County was clothed by State with the apparent authority to bind State on renewal requests, since there is no evidence contained in the record which explicitly reveals that either plaintiff, or Cox as plaintiff's agent, either entertained or had reason to

entertain the belief that County had issued a binder on plaintiff's renewal request. The better position advanced by plaintiff is that the conduct of State had the effect of creating an estoppel of State to reject plaintiff's renewal request, so that State should not now be heard to deny its liability to plaintiff.

One definition of estoppel embraces the concept of reliance, in good faith, on the part of the party asserting estoppel, to the extent that such party changes his position to his detriment in reliance upon the conduct of another, as a result of which such other party will not be permitted to raise a contention inconsistent with his misleading conduct. (*Allstate Insurance Co. v. National Tea Co.*, 25 Ill. App. 3d 449, 323 N.E.2d 521.) Not only is it essential that the party claiming the benefit of the estoppel doctrine had acted in good faith, but it is further required that he would not have so acted but for the conduct or representations of the other party and that he had no knowledge or convenient means of ascertaining the true facts which would have prompted him to react otherwise. *Dodd v. Rotterman*, 330 Ill. 362, 161 N.E. 756.

■■ ■ Plaintiff's position is predicated upon the process to which renewal requests were customarily subjected by these defendants. However, State contends that the evidence pertaining to the custom and usage which developed among defendants as between themselves is not relevant to this case because plaintiff's ignorance of such custom or usage precluded his reliance thereon. This contention is without merit because plaintiff's reasonable reliance upon his broker Cox brings plaintiff within the scope of applicability of such custom or usage. Evidence of this kind, if indeed an identifiable custom or business practice was established by any or all of these defendants, could be dispositive of whether a contract of insurance was created or whether a particular defendant should be estopped to deny liability. A custom or usage becomes binding upon parties if it has been uniformly acquiesced in and applied by the parties for such a period of time so as to indicate that the custom was contemplated by the parties at the time formation of the contract was undertaken. (*F. B. Miller Agency, Inc. v. Home Insurance Co.*, 276 Ill. App. 418.) A custom or usage should be established by the testimony of several witnesses. *F. B. Miller Agency, Inc. v. Home Insurance Co.*

A review of the record reveals that several witnesses testified with respect to the ordinary business procedures existing in 1965 between Cox and County and also between County and State. This evidence sufficiently established the customary business practices of these parties with respect to each other. Pursuant to these procedures, Cox submitted plaintiff's renewal request in writing to County, who in turn submitted the request in writing to State. The request was transmitted in writing, rather than by telephone, by both Cox and County because, in view of their

prior dealings with each other and with State, which included numerous similar transactions per month, sufficient time prior to the expiration of plaintiff's initial policy remained to enable State to consider the renewal request. In the event State rejected the request, coverage could still be secured for plaintiff with another company prior to October 12. Notwithstanding plaintiff's accident on October 1, Cox believed that plaintiff's policy would be renewed by State, and Cox assured plaintiff accordingly. County's president testified that, had he seen plaintiff's file in October of 1965 indicating the accident on October 1, it would have been his opinion, based upon State's underwriting practices, that State would reject the renewal request.

Plaintiff's initial insurance policy with State expired two working days after State received plaintiff's renewal request. Consideration of this request was first given by State six working days following receipt of the request and four days after the expiration date of the initial policy. On this same date, October 15, plaintiff was involved in the accident with the Stastny automobile. On the following day, ten days after plaintiff paid a deposit in Cox' office on the premium of the renewal policy, County was advised in writing by State that plaintiff's insurance policy would not be renewed. Within two days, County secured coverage for plaintiff with another company.

Notwithstanding their difference of opinion as to whether State would accept such a renewal request in light of plaintiff's driving record, both Cox and County's president testified that they would assume that the request had been accepted by State if they were not advised to the contrary within 3-4 days after transmitting the renewal request. Indeed, during this period Cox believed that the request had been accepted and mailed two letters to County requesting that the policy be delivered to him.

State's underwriting manager testified that the delay in acting on the request was occasioned by the fact that an employee in State's claims department had withdrawn plaintiff's file so that the October 1 accident could be investigated. The witness admitted, however, that during this investigation State was aware that plaintiff's initial policy expired on October 12.

■■ We find that the jury's verdicts against State but in favor of both Cox and County are amply supported by the evidence. Whether an unreasonable delay occurred in the processing of an application for insurance, or as here a renewal request, raises a question of fact for the trier of fact to resolve. (*Wille v. Farmers Equitable Insurance Co.*, 89 Ill. App. 2d 377, 232 N.E.2d 468.) After hearing the testimony and reviewing the exhibits, the jury could have properly concluded that both Cox and County handled plaintiff's renewal request in an expeditious manner in

accordance with their customary business practices with each other and with State. Furthermore, the evidence supports a finding that plaintiff suffered damages as a result of the unreasonably long period of time required by State to consider his renewal request. Upon this chronology of events, we consider that plaintiff reasonably believed that his insurance policy had been renewed and that State is estopped by its conduct from denying its liability to plaintiff under the renewal policy.

## IV.

State next contends that its liability to plaintiff cannot exceed the limits of coverage provided by plaintiff's insurance policy. State advances two arguments in support of this contention. First, State maintains that it did not prejudice any of its defenses as against plaintiff with respect to the existence of insurance coverage when it elected to represent plaintiff under a reservation of rights agreement in the action brought by Stastny. Second, State argues that the legal representation it afforded plaintiff was conducted in good faith.

■■ An insurer's duty to defend its insured, or one purporting to be its insured, was defined in *McFadyen v. North River Insurance Co.*, 62 Ill. App. 2d 164, 170-71, 209 N.E.2d 833, 836:

> "The insurer's duty to defend is predicated not upon information in its possession which indicates or even proves noncoverage. Rather, it is predicated upon the allegations in the complaint in an action brought against the insured and when such allegations state facts which bring the case within, or potentially within, the coverage of the policy, the insurer is from this time on unjustified in not defending the insured."

If the company refuses to defend its insured in an action encompassed by the insurance policy, a breach of contract results, but the company's liability is limited to the terms of the policy plus the expenses incurred by the insured in retaining other representation. (*Gould v. County Mutual Casualty Co.*, 37 Ill. App. 2d 265, 185 N.E.2d 603, *overruled on other grounds*, *Smith v. Andrews*, 54 Ill. App. 2d 51, 203 N.E.2d 160.) If the company refuses to provide an unrestricted defense and desires to ultimately urge exclusionary coverage defenses or deny the existence of coverage, it must either secure a declaratory judgment of its rights while defending its potential insured under a reservation of rights, or defend its potential insured under a reservation of rights and adjudicate its liability under the terms of the policy in a supplemental suit. (*Country Mutual Insurance Co. v. Murray*, 97 Ill. App. 2d 61, 239 N.E.2d 498.) Regardless of which alternative is chosen, the insured should be immediately notified of the possible conflict of interest between his interests and the interests of his insurance company so as to enable him to give informed

consideration to the retention of other counsel. *Catherwood v. Morris*, 360 Ill. 473, 196 N.E. 519.

During the time in which the instant appeal was being perfected, we noted in *Cowan v. Insurance Company of North America*, 22 Ill. App. 3d 883, 318 N.E.2d 315, that, in instances where a possible conflict of interest might exist under the policy between the insurer and the insured, the preferable course for the insurer to pursue is to file a declaratory judgment action as soon as the possible conflict is realized, joining all interested parties so that the possible "conflicts are ventilated in a proper judicial environment thereby preserving the integrity of the insurance policy as well as the attorneys who find themselves in such a distasteful situation." (22 Ill. App. 3d 883, 897, 318 N.E.2d 315, 326.) However, by selecting the other alternative, which in our opinion is less desirable, State did not prejudice its right to subsequently deny the existence of the policy.

Having previously determined that State is estopped to deny its liability to plaintiff, we must now determine whether the extent of State's liability should be confined to the policy limits.

■■■ When conducting the defense of its insured in an action where a recovery against the insured might exceed the policy limits, the interests of the insured must be considered by the company throughout the proceedings. (*Cernocky v. Indemnity Insurance Company of North America*, 69 Ill. App. 2d 196, 216 N.E.2d 198.) Although it has been stated that the company's duty to its insured is paramount to the attention which may be given by the company to its own interests in the litigation (*Allstate Insurance Co. v. Keller*, 17 Ill. App. 2d 44, 149 N.E.2d 482, citing *American Employers Ins. Co. v. Goble Aircraft Specialties, Inc.* (1954), 205 Misc. 1066, 131 N.Y.S.2d 393), it is clearly incumbent upon the company to give at least equal consideration to its insured's interests. (*Ballard v. Citizens Cas. Co. of New York* (7th Cir. 1952,), 196 F.2d 96.) However, in the absence of fraud, negligence or bad faith, the insurance company cannot be held liable for the full amount of judgment entered against its insured merely because it refused to settle the case either before or during trial for an amount within the policy limits, even though such refusal resulted in a judgment exceeding the insurer's liability under the terms of the policy. (*Cernocky v. Indemnity Insurance Co. of North America; Olympia Fields Country Club v. Bankers Indemnity Insurance Co.*, 325 Ill. App. 649, 60 N.E.2d 896.) Whether the evidence presented on this issue is sufficient to show fraud, negligence or bad faith raises a question of fact. *American Mut. Liability Ins. Co. v. Cooper* (5th Cir. 1932), 61 F.2d 446.

By his fourth amended complaint, plaintiff specifically alleged "bad faith" on the part of State by its refusal to accept a pretrial settlement

offer for the policy limits. Although several factors could have the cumulative effect of showing bad faith on the part of an insurance company, we will initially assess the reasonableness of the decision to proceed to trial made by State in its representation of plaintiff in the *Stastny* action.

There were no eyewitnesses of the Stastny-DeGraw accident. And as a result of the collision, neither plaintiff nor Stastny were able to recall the sequence of events giving rise to the accident. Following an investigation, a police report was prepared which revealed that impact had occurred in the lane in which the Stastny automobile was traveling.

A partner of the law firm which was selected by State to represent plaintiff in the *Stastny* action testified in the instant case. In 1965, he was serving on the board of directors of, and also as an assistant general counsel for, State. The stock he and his partner owned individually in State constituted a majority interest. Prior to the *Stastny* trial, he discussed the accident with plaintiff, but did not reveal his interest in State nor the possible range of an adverse verdict. He further testified that, although a verdict of $55,000 against plaintiff could have been contemplated, he considered at that time that a favorable verdict on the question of plaintiff's liability to Stastny was just as probable as the return of an adverse judgment.

Another witness in the instant case had been a claim adjuster for over 40 years. In response to a hypothetical question describing a situation similar to the Stastny-DeGraw accident, the witness opined that "it would be practically impossible [for plaintiff] to defeat [Stastny's] claim from a liability standpoint." He stated that a verdict against plaintiff ranging between $50,000 and $70,000 could be anticipated.

In addition to the likelihood of an adverse judgment against him in the *Stastny* action, plaintiff argues that bad faith was manifested by his counsel's conduct during pretrial preparation for that case. State attorneys requested that he sign certain answers to interrogatories in which he stated that he was without automobile liability insurance coverage on the date of the accident. State then attempted to have these answers to interrogatories admitted in the instant case. As a result of this sequence of events, plaintiff contends that State was not only defending him in the *Stastny* case, but was also preparing its case against him in the event that additional litigation was commenced by plaintiff following the *Stastny* decision.

■■ This evidence upon which plaintiff relies was properly elicited before the jury and tends to depict bad faith on the part of State. Consequently, we will not disturb the jury's determination that State is accountable to plaintiff for the entire amount of the verdict previously entered against plaintiff.

## V.

By its last two contentions, State argues that prejudicial error was committed by the trial court in its rulings upon certain answers to interrogatories, signed statements by plaintiff, and tendered instructions. Not only are these arguments advanced without the benefit of supportive legal authority or the showing of prejudice, but we consider State's position to be unpersuasive as well. Hence, we will not reverse this case on these grounds alone. *Campbell v. Ragel,* 7 Ill. App. 2d 301, 129 N.E.2d 451; *Swanson v. Chester Johnson Electric Co.,* 5 Ill. App. 2d 175, 125 N.E.2d 304.

## VI.

In view of the foregoing, the judgment of the circuit court is affirmed.[3]

Judgment affirmed.

HAYES and DOWNING, JJ., concur.

---

[3] A rule to show cause was issued in the instant case ordering plaintiff's appellate counsel to show cause why he should not be held in contempt of this court for his failure to comply with Supreme Court Rule 343 (Ill. Rev. Stat. 1975, ch. 110A, par. 343) with respect to the timely filing of briefs. Counsel had been granted numerous extensions to the period within which he was required to file a brief on behalf of plaintiff-appellee. The last extension required this brief to be filed on or before November 15, 1974, but this brief was not filed until February 5, 1975.

By his answer to the rule to show cause, respondent attributed his conduct to his busy practice, both in emergency litigation and in assuming the responsibilities of a former associate; his obligations to various professional organizations with which he was affiliated; and to his representation of several indigent matters. Respondent conceded that this explanation was unsatisfactory.

We acknowledge that respondent is an able attorney who has appeared before this court on numerous occasions. However, as was expounded upon in *Gray v. Gray,* 6 Ill. App. 2d 571, 128 N.E.2d 602, the effective administration of justice is dependent in part upon the understanding that justice should not be unduly delayed. Thus, when one's practice increases to the point that justice is being unreasonably delayed, either additional associates should be retained to accommodate the expanding workload, or the client should be referred to other counsel.